## In re CHAMPION ENTERPRISES, INC., SECURITIES LITIGATION

**Joel Miller, Gary Kissiah, Simche Margulies, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Champion Enterprises, Inc., a Michigan corporation; and Walter Young, Defendants.**

**Nos. 99–74231, 99–75162, 99–76206.**

United States District Court, E.D. Michigan, Southern Division.

April 9, 2001.

E. Powell Miller, Mantesa, Miller and Mantesa, Troy, MI, Richard Acocelli, Weiss & Yourman, New York, NY, Stephen Wasinger, Wasinger, Kickham and Kohls, Royal Oak, MI, Aaron Brody, Julie Brody, Paul T. Curley, Stull, Stull & Brody, New York, NY, Lionel Z. Glancy, Peter A. Binkow, Law Offices of Lionel Z. Glancy, Los Angeles, CA, Leo W. Desmond, Palm Beach, CA, Brian P. Murray, Rabin & Peckel, New York, NY, for Plaintiff.

Andrew J. McGuinness, Dykema Gossett, Ann Arbor, MI, Timothy Nelson, Donna McDevitt, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Defendant.

## OPINION

FEIKENS, District Judge.

## I. INTRODUCTION

The plaintiffs bring this action, over which I have jurisdiction, against Champion Enterprises, Inc. and Chief Executive Officer (CEO) Walter Young under sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Rule 10b–5, promulgated by the Securities Exchange Commission (SEC). Defendants move to dismiss plaintiffs' consolidated amended purported class action complaint basing their motion on the Private Securities Litigation Reform Act of 1995 (PSLRA or Reform Act).[1]

This case is a consolidation of three separate purported class actions, *Miller v.* *Champion* (No. 99–74231), *Kissiah v. Champion* (No. 99–75162), and *Marguiles v. Champion* (No. 99–76206) against Champion Enterprises, Inc., which is headquartered in Auburn Hills, Michigan. *Miller v. Champion,* the first of these cases, was filed on August 26, 1999 in the Eastern District of Michigan. *Marguiles v. Champion* was filed in the Eastern District of New York on September 1, 1999 and transferred here in December, 1999. *See* Transfer Order 12/10/99. *Kissiah v. Champion* was filed on October 21, 1999 in the Eastern District of Michigan. I issued an order consolidating these three cases on March 31, 2000. *See* Pre–Trial Order Number 1, 3/31/00.

In the Pre-trial Order Number 1, of March 30, 2000, I permitted and defendants stipulated to the filing of the consolidated amended complaint. On May 15, 2001, plaintiffs filed their consolidated amended complaint. Defendants filed a motion to dismiss the consolidated amended complaint on June 30, 2001. At a scheduling hearing on September 21, 2000, I ordered the parties to file supplemental briefs addressing the pleading requirements of the Reform Act within 60 days. These briefs were due to be filed on November 21, 2000.

Prior to the filing of their supplemental brief, plaintiffs' counsel sent a letter informing me that they intended to seek leave to amend and requesting that I postpone the supplemental briefing. I denied this request but informed them that they could file a motion for leave to amend at the time they filed their supplemental brief. The supplemental briefs were filed on November 21, 2000. Plaintiffs filed

1. Plaintiffs have also filed two motions for leave to again amend their complaint on which I have not yet ruled.

their motion for leave to amend on December 1, 2000.

I held a hearing on March 8, 2001 on defendants' motion to dismiss. On March 27, 2001 defendants filed yet another motion for leave to amend their complaint.

## II. BACKGROUND

Champion Enterprises Inc. (Champion) manufactures mobile and modular homes. It sells manufactured homes through both company-owned and independent retail stores. Ted Parker Homes Sales, Inc. (Parker Homes) was Champion's largest independent retailer. On July 8, 1999, in a letter to investors, Champion announced that it was comfortable with an earnings estimate of $0.59 per share, a 13% increase for its second quarter ending on July 3, 1999. In a press release and conference call with shareholders and securities analysts on July 21, 1999 Champion announced that its second quarter earnings were in fact $0.59.

Parker Homes filed for bankruptcy on July 22, 1999. On July 30, 1999, in a press release and conference call with shareholders and securities analysts, Champion announced that due to Parker Homes' bankruptcy filing, it would record a one-time pre-tax charge of $33.6 million in the third quarter of 1999 stating as its reason that it was required to repurchase $69 million of Parker Homes' inventory. This duty to repurchase was pursuant to agreements between Champion and the finance companies that had provided floor plan financing for Parker's inventory purchases, which Champion disclosed in the press release and conference call. Champion also disclosed that it expected to incur a loss because it would have to discount the repurchased inventory in order to resell it. On August 9, 1999, Champion filed its form 10–Q with the SEC for its second quarter which ended July, 3, 1999. On August 26,

1999 Champion announced that it estimated lower earnings for the second half of 1999. Both these announcements were followed by a large drop in Champion's stock price. The crux of the plaintiffs' claims is that defendant actually knew before the close of the second quarter that Parker Homes was going to file for bankruptcy and therefore recklessly overstated earnings, revenues and projections. *See* Cmplt. ¶ 4. The first of these actions was filed on August 26, 1999.

## III. ISSUES

Two issues are raised by defendant's motion to dismiss. First, do any of plaintiffs' allegations come within the safe harbor provision of the Private Securities Litigation Reform Act of 1995? Second, as to allegations which do not come within the safe harbor provision, have plaintiffs adequately pleaded the requisite state of mind under the heightened pleading requirements of the Reform Act?

## IV. RELEVANT STATUTES

There are several relevant statutes and rules which require consideration. They include section 10(b) of the Securities and Exchange Act of 1934, Rule 10b–5 promulgated thereunder by the SEC, section 20(a) of the Securities and Exchange Act of 1934, Rule 9(b) of the Federal Rules of Civil Procedure and, importantly, the Private Securities Litigation Reform Act of 1995.

### A. Private Securities Litigation Reform Act of 1995

The outcome of this motion to dismiss rests on the application of the Private Securities Litigation Reform Act of 1995. The language of the statute is clear and therefore it is the language itself that is important. The relevant portions of the statute are quoted below:

15 U.S.C. § 78u–4 Private Securities Litigation

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, *the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.* (Emphasis added.)

15 U.S.C. § 78u–5 Application of safe harbor for forward-looking statements

(a) Applicability

This section shall apply only to a forward-looking statement made by—

(1) an issuer that, at the time that the statement is made, is subject to the reporting requirements of section 78m(a) of this title or section 78o(d) of this title;

(2) a person acting on behalf of such issuer;

(3) an outside reviewer retained by such issuer making a statement on behalf of such issuer; or

(4) an underwriter, with respect to information provided by such issuer or information derived from information provided by such issuer.

(b) Exclusions

Except to the extent otherwise specifically provided by rule, regulation, or order of the Commission, this section shall not apply to a forward-looking statement—

. . . .

(2) that is—

(A) included in a financial statement prepared in accordance with generally accepted accounting principles

(B) contained in a registration statement of, or otherwise issued by, an investment company;

(C) made in connection with a tender offer;

(D) made in connection with an initial public offering;

(E) made in connection with an offering by, or relating to the operations of, a partnership, limited liability company, or a direct participation investment program; or

(F) made in a disclosure of beneficial ownership in a report required to be filed with the Commission pursuant to section 78m(d) of this title.

(c) Safe harbor

(1) In general

Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of

this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

 (A) the forward-looking statement is—

 (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

 (ii) immaterial; or

 (B) the plaintiff fails to prove that the forward-looking statement—

 (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

 (ii) if made by a business entity; was—

 (I) made by or with the approval of an executive officer of that entity; and

 (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

(2) Oral forward-looking statements

In the case of an oral forward-looking statement made by an issuer that is subject to the reporting requirements of section 78m(a) of this title or section 78o(d) of this title, or by a person acting on behalf of such issuer, the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied—

 (A) if the oral forward-looking statement is accompanied by a cautionary statement—

 (i) that the particular oral statement is a forward-looking statement; and

 (ii) that the actual results might differ materially from those projected in the forward-looking statement; and

 (B) if—

 (i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

 (ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

 (iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

(3) Availability

Any document filed with the Commission or generally disseminated shall be deemed to be readily available for purposes of paragraph (2)

(4) Effect on other safe harbors

The exemption provided for in paragraph (1) shall be in addition to any exemption that the commission may establish by rule or regulation under subsection (g) of this section.

(d) Duty to update

Nothing in this section shall impose upon any person a duty to update a forward-looking statement.

(e) Dispositive motion

On any motion to dismiss based upon subsection (c)(1) of this section, the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.

(f) Stay pending decision on motion

In any private action arising under this chapter, the court shall stay discovery (other than discovery that is specifically directed to the applicability of the exemption provided for in this section) during the pendency of any motion by a defendant for summary judgment that is based on the grounds that—

(1) the statement or omission upon which the complaint is based is a forward-looking statement within the meaning of this section; and

(2) the exemption provided for in this section precludes a claim for relief.

. . . .

(i) Definitions

For purposes of this section, the following definitions shall apply

(1) Forward-looking statement

The term "forward-looking statement" means—

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the commission.

. . . .

(4) Person acting on behalf of an issuer

The term "person acting on behalf of an issuer" means any officer, director, or employee of such issuer.

. . . .

## B. Section 10(b) of the Securities and Exchange Act of 1934

Plaintiffs' complaint is based on section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j) and SEC's rule 10b–5 (17 CFR 240.10b–5). Both 10(b) and rule 10b–5 prohibit the use of fraud or deceptive devices in the issuance or sale of securities. This prohibition includes any misstatement or omission of material fact that is made with the requisite scienter: recklessness.

## C. Section 20(a) of the Securities and Exchange Act of 1934

Plaintiffs also allege a violation of section 20(a) of the Securities and Exchange Act of 1934. See 15 U.S.C. § 78t. Section 20(a) holds a person liable for a violation of the Securities and Exchange Act if that person controls the person whose action caused the violation. However, it also allows for a defense if the controlling person acted in good faith.

## D. Rule 9(b) of the Federal Rules of Civil Procedure

Because a case based on section 10(b) of the Securities and Exchange Act of 1934 is necessarily a case of fraud, Rule 9(b) of the Federal Rules of Civil Procedure ap-

plies. Rule 9(b) requires that fraud be pleaded with particularity, though scienter may be averred generally.

## V. CASELAW

The main principle of the Reform Act is that a case of securities fraud must be carefully pleaded. The Reform Act encourages communication between issuers of stock and investors by addressing both forward-looking and non forward-looking statements. It protects forward-looking statements with a safe harbor provision so that if the statement is made with meaningful cautionary language, adequately warning the investor, there is no inquiry into the scienter with which the statement is made. Only for a forward-looking statement without cautionary language does a court consider scienter. Then, the plaintiff must allege actual knowledge of the statement's falsity. In the case of a non-forward-looking statement the court also inquires into scienter. Then the scienter required is recklessness. This serves not only to encourage the free flow of information but also serves to discourage the filing of groundless claims each time there is fluctuation in the stock market.

Concerned with a flood of groundless claims of securities fraud, Congress enacted the Private Securities Litigation Reform Act of 1995. The Reform Act substantially heightened the pleading standards required to survive a motion to dismiss a securities fraud claim. Though the Reform Act did not change the scienter that a plaintiff must plead and ultimately prove (recklessness), it now requires that the plaintiff "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. 78u–4(b)(2); *See In Re Comshare, Inc.*

*Securities Litigation*, 183 F.3d 542, 548–49 (6th Cir.1999) ("[T]he PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss.") If the plaintiff does not adequately allege scienter, regarding non-forward-looking statements, the complaint must be dismissed. *See* 15 U.S.C. § 78u–4(b)(3)(A) ("The court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.") "To establish a defendant's liability under § 10(b) a plaintiff must *as a threshold matter* allege in his complaint that the defendant acted with sufficient scienter." *Comshare* at 548 (citing *SEC v. U.S. Envtl. Inc.*, 155 F.3d 107, 111 (2d Cir.1998)) [emphasis added].

Plaintiffs claim that the defendants violated section 10b of the Securities and Exchange Act of 1934 and the SEC's rule 10–b(5). Therefore, as to non forward-looking statements, plaintiffs must allege a misstatement or omission of material fact, made with scienter, upon which the plaintiffs relied and which caused their injury. *See Comshare* at 548. In order to overcome a motion to dismiss, the plaintiffs must also allege that the defendants acted with sufficient scienter. *See Id.* Under current law the scienter required is recklessness. Recklessness is defined as more than mere negligence but less than intent. *See Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1024 n. 36 (6th Cir.1979). The Sixth Circuit has further defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* at 1025.

In addition to the heightened pleading requirements established by the Reform Act, Congress also created a safe harbor for forward-looking statements. *See* 15

U.S.C. § 78u–5. If a statement falls within the safe harbor it cannot be the basis for a securities fraud action. In determining whether a statement is protected by the safe harbor, the initial inquiry is whether or not a statement is forward-looking. The statute clearly defines forward-looking statements. These definitions are clear cut and include, for example, projections of earnings and losses per share, dividends, economic projections and future plans and objectives. Less clear cut, however, is when a forward-looking statement and a non forward-looking statement are cited in the same allegation, i.e., a mixed statement. "The mixed nature of the statement raises the question whether the safe harbor benefits the entire statement or only parts of it." *Harris v. Ivax*, 182 F.3d 799, 806 (11th Cir.1999).

■ I adopt the Eleventh Circuit's approach which holds that a mixed statement should be considered as a whole. "[W]hile the statute does not tell us exactly what to do with a mixed statement, . . . . were we to banish from the safe harbor lists that contain both factual and forward-looking factors, we would inhibit corporate officers from fully explaining their outlooks. Indeed, liability conscious [corporate] officers would be relegated to citing only the factors that could individually be called forward-looking. That would hamper the communication that Congress sought to foster." *Ivax* at 806–07. Because my inquiry is limited to the statements specified in the complaint, "if the allegation is that the whole [quote] is misleading, then it makes no sense to slice the [quote] into separate sentences. Rather, the [quote] becomes a 'statement' in the statutory sense, and a basis of liability as a unit." *Ivax* at 806.

■ A forward-looking statement is afforded protection under either of two independent prongs. Under the first prong, if a forward-looking statement is accompanied by meaningful cautionary language it is not actionable. *See* 15 U.S.C. § 78u–5(c)(1)(A). Such cautionary language may be found either within the statement itself or in a readily available document that is incorporated by reference. In order to be meaningful, the cautionary language must warn of risks of similar significance to the risk actually realized. *See Ivax* at 807. The risk that actually materialized need not be included in the cautionary language. However, there must be more than a recitation of mere generalized risks applicable to any business venture, such as the state of the economy. The risks should be specifically tailored to the issuer's business and to the forward-looking statements. *See, e.g.*, Victor I. Lewkow, Disclaiming Liability For Forward–Looking Statements, 1095 PLI/Corp. 499, 513. Otherwise the language would merely be boilerplate.

■ Under the second prong, even if the forward-looking statement is not accompanied by meaningful cautionary language, and the plaintiff does not allege that the statement was made with actual knowledge of falsity, it also can *not* be the basis of an action for securities fraud. The author of the statement must *actually know* that the statement is *false* (not merely misleading). Knowledge may not be imputed or assumed and this must be specifically alleged.

## VI. ANALYSIS

In ruling on the defendants' motion I have analyzed the sufficiency of each allegation/paragraph of the complaint. My analysis is based on the plain wording of the statute. The text makes the requirements unambiguous that the plaintiffs' pleading must fulfill. It requires no delving into legislative history to glean the statute's intent. *See, e.g. Crosby v. Na-*

*tional Foreign Trade Council,* 530 U.S. 363, 390–91, 120 S.Ct. 2288, 2303–04, 147 L.Ed.2d 352 (Scalia, J. concurring)(2000). Justice Scalia writes:

> Of course even if all the Court's invocations of legislative history were not utterly irrelevant, I would still object to them, since neither the statements of individual Members of Congress (ordinarily addressed to a virtually empty floor) nor Executive statements and letters addressed to congressional committees, nor the nonenactment of other proposed legislation is a reliable indication of what a majority of both Houses of Congress intended when they voted for the statute before us. The *only* reliable indication of *that* intent—the only thing we know for sure can be attributed to *all* of them—is the words of the bill that they voted to make law....I consider that [reliance on legislative history] to be ...harmful, since it tells future litigants that, even when a statute is clear on its face and its effects clear upon the record, statements from the legislative history may help (and presumably harm) the case. *Id.*

As stated clearly by the Reform Act, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u–4(b)(2). I need not analyze the facts here. This is what the plaintiff must prove. However, the plaintiff cannot prove what the plaintiff has not alleged.

## A. Safe Harbor Provision

I begin my inquiry with statements which may qualify for safe harbor protection of the Reform Act. "On any motion to dismiss based on subsection (c)(1) of this section [safe harbor for forward-looking statements], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u–5(e).

There are twelve allegations which include forward-looking statements. Before the hearing on this motion parties stipulated that four events quoted in eight allegations might arguably be said to contain forward-looking statements and be eligible for safe harbor protection. These were the July 8, 1999 letter (¶ 35), the July 21, 1999 Press release (¶ 36) and conference call (¶¶ 37, 38), the July 30, 1999 Press Release (¶ 43) and conference call (¶ 44–45) and the August 9, 1999 filing of the form 10–Q with the SEC (¶ 46). I also note that there are five additional allegations which require analysis under the safe harbor provision.

1. The July 8, 1999 letter to investors comes within the safe harbor of the Reform Act.

Plaintiffs quote a letter from Champion's CEO Walter Young to Shareholders in paragraph 35 of their complaint:

> As we start the second half of the year, we know that you are as concerned as we are regarding the performance of Champion Enterprises stock compared with the overall market. Housing stocks in general have underperformed the markets in 1999, and we are no exception. Given the continuation of outstanding earnings growth and the successful implementation of our retail strategy, we challenge ourselves as to what we can do to enhance our stock value in a market dominated by Internet and the Dow Jones Nifty 50 stocks.

> Several brokerage firms, including Donaldson, Lufkin and Jenrette, Credit Suisse First Boston, CIBC Oppenheim-

er, Jeffries & Co., Southwest Securities and C.L. King, continue to recommend that investors purchase Champion stock. Some of our competitors have reported problems with meeting earnings estimates. Champion recently announced that we were comfortable with consensus earnings estimates of $.59 per share for the second quarter, which would be a 13 percent increase compared to last year.

### a. The July 8, 1999 letter is a forward-looking statement

Since the plaintiffs quote the paragraphs above as the substance of one allegation, I consider them in their entirety. *See Ivax* at 806. Taken as a whole, the statements from the July 8 letter are forward-looking. This is signaled by the very start of the letter which states, "As we start the second half of the year. . . ." The quoted portion of the letter also refers to the challenges defendants set for themselves in order to enhance Champion's stock performance. Finally, though plaintiffs argue that because much of the letter is written in the present tense, this purely grammatical argument holds no water. The word "continue" that plaintiffs rely on indicates an ongoing condition, the truth of which cannot be verified until after the statement is made and therefore the statement is necessarily forward-looking. *See Ivax* at 805. Paragraph 35 contains statements clearly defined by the Reform Act as forward-looking: projection of earnings per share (15 U.S.C. § 78u–5(i)(A)) and plans and objectives for future operations (15 U.S.C. § 78u–5(i)(B)).

### b. The July 8, 1999 letter is accompanied by meaningful cautionary language.

In order to come within the safe harbor provision, the July 8 letter must be "ac-companied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the [letter]." 15 U.S.C. § 78u–5(c)(1)(A). At the end of the July 8 letter, directly under Young's signature, is the following statement:

This letter contains certain statements, including discussions of the company's retail strategy, goals for sales and earnings growth, and expanding and improving operations, which could be construed as forward-looking statements. . . . These statements reflect the company's views with respect to future plans, events and financial performance. The company has identified certain risk factors which would cause actual results and plans to differ substantially from those included in the forward-looking statements. These factors are discussed in Item 1 Business of the company's 1998 Form 10–K, and this discussion regarding risk factors is incorporated herein by reference.

Champion's 1998 Form 10–K warns:

Long-term growth in the manufactured housing industry (wholesale and retail) may be affected by: (1) the relative cost of manufactured housing versus other forms of housing; (2) general economic trends, including inflation and unemployment rates, consumer confidence, job growth and interest rates; (3) changes in demographics, including new household formations and the number of Americans on fixed income; (4) the availability and cost of financing for manufactured homes; (5) changes in government regulations and policies, including HUD regulations, local building codes and zoning regulations; and (6) changes in regional markets and the U.S. economy as a whole. Short-term sales could be affected by inclement weather and inventory levels of manu-

factured housing retailers. Fluctuations in interest rates may affect the demand for manufactured housing to the extent that those changes reduce job growth, slow the U.S. economy, or cause a loss in consumer confidence. The profitability of the Registrant may also be affected by: (1) its ability to efficiently expand operations and to utilize production capacity; (2) its ability to pass increased raw material costs, particularly lumber costs, on to its customers; (3) market share position; (4) growth in the manufactured housing industry as a whole; (5) the results of its acquisitions; and (6) the strength of retail distribution.

In addition to this paragraph, throughout the Form 10–K, some of these factors are discussed in greater depth. Furthermore, the letter itself contains explicit cautionary statements beginning with the acknowledged concern in the first paragraph stating that "housing stocks in general have underperformed" as well as the statement that Champion faces challenges in the marketplace, specifically, "in certain regions we see too many retail locations, suggesting an over supply of retail inventory of homes in that region."

The Form 10–K is the type of "readily available document" that may be incorporated by reference according to the Reform Act's safe harbor provision. *See* 15 U.S.C. § 78u–5(c)(2)(B)(i), 15 U.S.C. § 78u–5(c)(3). Though the quoted portion of the Form 10–K warns of general factors, such as unemployment, inflation and market share position, that affect all issuers, it warns also of factors specific to Champion, such as lumber costs and building codes. These factors are explained in other portions of the Form 10–K. Though plaintiffs argue that these are not the actual risks that materialized, Champion is not obligated to foretell the future. Champion need only warn of risks of similar significance to those that materialize. Moreover,

the Reform Act's safe harbor provision also incorporates the judicially created "bespeaks caution" doctrine which states, "[p]articularly in a fraud on the market case, the relevant inquiry concerns the total mix of information available to the market at the time of the allegedly fraudulent statements." *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1122–23 (10th Cir.1997)(citing *Basic, Inc. v. Levinson,* 485 U.S. 224, 246, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Taken together, both the text of the letter and the incorporated warnings from the 1998 Form 10–K identify "important factors that could cause actual results to differ materially from those in the [July 8 letter]." 15 U.S.C. § 78u–5(c)(1)(A)(i). Therefore, the statements quoted from the July 8 letter, contained in paragraph 35 of the complaint are protected under the first prong of the safe harbor provision. Paragraph 35 must be dismissed.

2. The July 21, 1999 press release comes within the safe harbor of the Reform Act.

■ Plaintiffs quote the following language from Champion's July 21, 1999 press release on the PNRNewswire almost in its entirety in paragraph 36 of their complaint:

Quarterly revenues increased 14 percent to $665 million from $583 million in 1998. Net income reached $29 million, up 13 percent, and diluted earnings per share also grew 13 percent to $0.59 from $0.52 last year.

For the year-to-date period, income was $1.02 per diluted share, up 16 percent from $0.88 last year. Consolidated revenues rose 23 percent to $1.3 billion for the six months, and net income was $50 million, a 16 percent improvement over a year ago. For the first half of the year, operating income increased 23 percent

to $95 million, resulting in an operating margin of 7.4 percent of revenues.

CEO Young is quoted both in the press release and the complaint:

We are pleased to report another record quarter of revenues and earnings, with overall operating margins increasing to 8.1 percent of revenues. Our retail organization contributed substantially to the quarter and year-to-date performance, while our wholesale market share improved over 20 percent. These strong results continue to demonstrate the success of our strategic retail expansion and manufacturing advantage in a competitive market.

New retail locations and higher sales of Champion-produced homes at company stores should generate sales and earnings growth in 1999.... We recently implemented management changes in our retail organization to improve productivity. During the quarter we also started HomePride Finance Corporation, which consolidates consumer loans originated by our retailers and places them with third party finance companies. Long term, we should benefit from higher finance related income, while continuing to keep loan risk and recourse with the finance companies.

We recently created Champion Development Corp. to assist in the development, management and sale of our homes in new communities. As a minority partner in future developments, we expect these new initiatives to broaden our consumer base. We also started a new program to match our retailers with developers who might be interested in using our homes as an alternative to site-built construction. Our Alliance of Champions marketing program for independent retailers continues to grow and now numbers close to 700 locations. All

of these programs should help to stimulate future manufacturing sales growth. While our retail traffic remains healthy and we continue to keep our inventory levels under tight control, the biggest short-term challenge we face is to improve the industry's retail inventory excesses. Even though we anticipate that our retail sales should be strong for the remainder of the year, we expect that industry wholesale shipments could be down until this temporary adjustment is completed. We have consolidated manufacturing production in the Pacific Northwest and postponed construction of a plant in Colorado. We plan to open new plants in Arizona and Kentucky, and reopen our plant in New York. Because over two-thirds of our manufacturing costs are variable, we believe we can adjust to market demand quickly and further consolidate production if necessary.

Champion has become the largest and one of the most profitable companies in the housing industry by adhering to a minimum 20 percent return on investment guideline for internal expansion programs and for acquisitions. Long term we look to grow earnings per share by 15 percent annually. Our size, people, flexibility, and financial strength should continue to benefit us as we take advantage of opportunities in the market place.

a. The July 21 press release is a forward-looking statement.

The above quoted paragraphs contain statements of historical fact as well as forward-looking statements. Plaintiffs do not differentiate between the statements nor do they make separate allegations for any of the sentences. They merely lump them together in one allegation. This is the type of mixed system contemplated by

the 11th Circuit in *Harris v. Ivax*. Therefore, I must consider the statements quoted in paragraph 36 as a whole. The majority of the statements details new or recent development strategies and programs which Champion anticipates "should help stimulate future sales growth." The quoted portion of the press release is full of forward-looking language. These are forward-looking statements as defined by the Reform act. They are "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," and also "statement[s] of future economic performance," and the assumptions upon which the predictions are based. 15 U.S.C. § 78u–5(i)(B)–(D).

b. The July 21 press release is accompanied by meaningful cautionary language.

The press release quoted in paragraph 36 referred readers to the 1998 Form 10–K for a discussion of risk factors which might cause actual results to differ materially from predictions. The warnings contained in the 1998 Form 10–K referenced in the press release constitute meaningful cautionary language. *See* section IV.A.1.b *supra*. The press release also contains cautionary language regarding shipment reductions and industry excess. Thus, the statements specified by the plaintiffs in paragraph 36 are protected under the first prong of the Reform Act's safe harbor provision, and paragraph 36 must be dismissed.

3. The July 21, 1999 conference call comes within the safe harbor of the Reform Act.

■ In paragraphs 37 and 38 plaintiffs refer to and paraphrase statements from a July 21, 1999 conference call between Champion, its shareholders and securities analysts. Paragraph 37 reads:

"During a July 21, 1999 conference call in which he trumpeted the Company's second quarter sales and earnings figures (described in the prior paragraph), CEO Young quantified the industry-wide retail inventory excess—just recently publicly acknowledged by Champion—at 20,000 homes, and characterized it as about a 'one month' supply. CEO Young stated that with this increase in retail inventory, industry-wide 'turn' had dropped below 2.5, which was the 'overall' turn level for Champion's independent retailers; Champion's 282 retail outlets had remained 'a little less than three times turn.' ('Turn' is an industry term that measures the turnaround of on site inventory. Thus if a retailer had 20 homes on site and was operating on a 2.5 turn, the retailer would sell 50 homes that year.) Nevertheless, CEO Young repeated several times that Champion was 'managing' and 'watching' its independent retailer inventory to improve the 'turn.' "

Paragraph 38 reads:

During the July 21, 1999 conference call, Elliot Glazer, with Dupasquier & Company, asked CEO Young whether Champion was voluntarily repurchasing inventory from weaker retail dealers. CEO Young responded that he could not be 'adamant enough' that Champion made no voluntary repurchases and that repurchases were limited to Champion's repurchase obligations to third party floor finance lenders when a retailer went bankrupt. According to CEO Young: 'Under inventory floor planning, if a dealer goes bankrupt, we have an obligation under a limited time period to the finance company, to take back the inventory.' Mr. Glazer then asked the follow up question: 'Have any of your

dealers gone bankrupt?' CEO Young responded:

'I think one or two out of 3,500 across the country. There have been some. But... under the repurchase obligations...out of 70,000 homes that we build a year, I think we took back 100–110 homes last year, Elliot.'

As set forth in the Company's Form S–4 Registration Statement filed July 30, 1999, in connection with a $200 million note offering, Champion repurchased 165 homes in 1998 and reported a loss after resale of $120,000, or approximately $725 per home.

a. The July 21 conference call is a forward-looking statement.

In paragraph 37 plaintiffs refer both to statements of historical fact and to forward-looking statements. The paragraph ends with Champion's assertion that it is watching and managing inventory to improve turn. Improving turn is a future objective of the management and is necessarily forward-looking. Because this is a mixed statement, all of the statements referred to in paragraph 37 are then considered forward-looking. Paragraph 38 however only refers to statements of current or historical fact. Therefore it is not forward-looking.

b. The July 21 conference call is not accompanied by meaningful cautionary language.

■ The July 21 conference call is not accompanied by meaningful cautionary language. The Reform Act has explicit requirements that must be fulfilled in regards to oral (as opposed to written) forward-looking statements. While Elizabeth Higashi, an employee of Champion, at the start of the conference call did warn that the conference call would contain possible forward-looking statements and referred

to a readily available written document, she failed to state that factors discussed in the document to which she refers could "cause actual results to materially differ from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(2)(B)(i). Paragraph 37 does not come within the first prong of the safe harbor provision.

c. Plaintiffs fail to allege the statements from the July 21 conference call were made with actual knowledge of falsity.

As is clear from the portion of the complaint above, plaintiffs fail to allege any scienter whatsoever, much less actual knowledge of falsity. Therefore, paragraph 37 comes within the second prong of the safe harbor provision of the Reform Act. Even though paragraph 38 does not contain forward-looking statements, the plaintiffs fail to allege any scienter. Thus, paragraphs 37 and 38 must be dismissed.

4. The July 30, 1999 press releases do not come within the safe harbor of the Reform Act.

The plaintiffs quote two July 30 press releases issued by Champion to the PRNewswire and to Reuters in paragraph 43 of the complaint:

In a complete reversal of the position taken in both its public statements and filings during the Class Period, all of which touted the Company's 'record' sales performance in the first half of 1999, in a July 30, 1999 PRNewswire press release, Champion made the shocking revelation that it would take a pre-tax charge of $33.6 million ($20.5 million after taxes), or 41 cents per share, for the third fiscal quarter of 1999, due to the bankruptcy filings by Parker Homes. CEO Young was quoted as stating:

"Coming right on the heels of a good second quarter earnings report and conference call with our shareholders, this bankruptcy action was not anticipated. As soon as we became aware of the filing, we addressed its impact and our course of action."

In another July 30, 1999 Reuters press release, the Company said:

"[I]t was temporarily shutting down its Maxton, N.C., facility due to the bankruptcy filing and declining wholesale demand in the Carolina region. Analysts estimated that Champion would report a profit of $0.60 per share, compared with $0.57 in the year-ago period, according to First Call."

a. The July 30 press releases are not forward-looking statements.

The statements quoted by the plaintiffs are arguably not forward-looking statements. They refer to past actions by the defendants. Therefore, these statements can not come within the safe harbor provision of the Reform Act.

b. Even so, plaintiffs fail to allege the July 30 press releases were written with the requisite scienter

Even though the statements from the July 30 press releases do not come within the safe harbor provision, plaintiffs still have not fulfilled the pleading requirements of the Reform Act. Plaintiffs must allege the requisite scienter, which, for non forward-looking statements, is recklessness. Plaintiffs fail to allege *any* scienter and thus, paragraph 43 must be dismissed.

5. The July 30, 1999 conference call comes within the safe harbor of the Reform Act.

■ On July 30, 1999 Champion held a conference call with shareholders and investors to discuss the Parker Homes bankruptcy and Champion's strategy in dealing with it. Plaintiffs quote portions of the conference call in paragraphs 44 and 45 of their complaint. In paragraph 44 they state:

During a conference call held on July 30, 1999, Champion explained to investors and securities analysts the reasons for Champion's devastating announcement in response to bankruptcy filings of its largest customer and its planned course of action. CEO Young opened the call with the following statements:

"This is not a good announcement today...We are the virtual exclusive supplier to Ted Parker Homes. *This Chapter 11 filing, which we totally—was unanticipated us* ...we need to directly and openly share our potential impact and our immediate plans in addressing this issue...That's why we announced today [a] third quarter charge of after-tax of $20.5 million or 41 cents a share...." (Emphasis supplied [by plaintiffs])

"...[W]e are certainly supporting Ted Parker Home Sales in its Chapter 11 situation that it has taken on, we will support it as a supplier and as a creditor where we are, and *we certainly hope that they can continue to operate through Chapter 11 and eventually come out of it.*" (Emphasis supplied [by plaintiffs]).

In paragraph 45 plaintiffs allege:

During the question and answer portion of the July 30, 1999, conference call, the following colloquies occurred:

Q: Could you tell me what kind of financial information you regularly get from ... Ted Parker?

A: Financial information does not necessarily have to be provided by them, and then there's always the

question of reliability on private financial statements. What we do instead is we try to track inventory and inventory turns, and monitor our liability with our retailer in that form, and *we keep close tabs on the contingent liability we have with each of our retailers.*

We had all impression the financials were going well....[T]his organization continued to grow and expand....[W]e had all impressions that *it was valid regardless of the financial statements* ....

Q: ...[R]egarding other repurchase liabilities what would be the dollar amount, worst case scenario?

A: Ted Parker has a unique style of high inventory....supposedly a very successful strategy. *By the way, it's not one we practice for our retail organization.*

Q: Do you have, or can you give me a sense, or give us a sense of what the circumstances were leading up to Ted Parker's bankruptcy?

A: ...[W]e have been working with Ted Parker over the years and part of his expansion working with him, and positive...[W]e have been watching their inventory turn....

Well, yes, we had obviously been watching their inventories, and they have been a high expansion company, but as recent as a couple of months, the management had come to us and informed us that they were going into an inventory reduction mode....

Q: When was that, like, in May or April, or something like that?

A: Mmm-hmm. And so that's what it so surprised us of the decision to go Chapter 11.

When asked a series of questions about the current status of Parker Homes's operations, CFO Stegmayer professed ignorance:

'[W]e can't speak for them and debtor possession, financing, whatever they might be preparing, we're not inside on that track. I mean, we're sitting here as outside creditors as any other creditor would be, so we really don't know.

When asked whether Parker Homes would go into liquidation rather than reorganization, CEO Young similarly replied: 'It is in Chapter 11, and we do not know, so we're flying blind too.'

a. The July 30 conference call is a forward-looking statement.

Again, both paragraphs 44 and 45 are mixed statements. Though they quote certain statements of historical facts, the overall import of the communication is to convey what Champion believes or hopes will happen with the Parker Homes bankruptcy. A hope of what will happen or an assertion of ignorance of what will happen is necessarily forward-looking.

b. The July 30 conference call is not accompanied by meaningful cautionary language.

Like the conference call held on July 22, again Elizabeth Higashi, Champion's employee moderating the call, fails to specifically state, as required by the Reform Act, that actual results might differ materially from the predictions. Therefore, the July 30 conference call was not accompanied by meaningful cautionary language.

c. Plaintiffs fail to allege the statements from the July 30 conference call were made with actual knowledge of falsity

Even though the July 30 conference call does not come within the first prong of the

safe harbor provision, it is protected under the second prong. Nowhere do plaintiffs allege any scienter in relation to these alleged misleading statements. In order to defeat the safe harbor provision plaintiffs had to allege that the statements in the conference call were made with actual knowledge of falsity. This they do not do and, therefore, paragraphs 44 and 45 come within the second prong of the safe harbor provision of the Reform Act and must be dismissed.

6. The August 10, 1999 Form 10–Q does not come within the safe harbor of the Reform Act.

■ On August 10, 1999, defendants filed with the SEC their Form 10–Q for their second quarter ending July 3, 1999. In paragraph 46 plaintiffs quote from note 11 to the Financial Statement section of the Form:

Regarding the effect of the Parker Homes bankruptcy, Champion's Form 10–Q for the second quarter of 1999, filed on August 9, 1999, stated:

On July 23, 1999 the registrant's largest independent retail customer filed a Chapter 11 bankruptcy petition. Sales to this customer represented 3.5% of Champion's wholesale home shipments in 1998 and 2.7% for the six months ended July 3, 1999. The registrant is contingently liable under repurchase agreements with the customer's inventory floor plan lenders and expects that it will be required to repurchase *most* of the inventory for which it is contingently liable. The maximum repurchase obligation for this customer, excluding the resale value of the homes, is approximately $69 million. As a result of this situation, the registrant has consolidated its manufacturing operations in North Carolina and temporarily idled its Maxton, North Carolina facility. Champion also plans to open approximately 20 new retail sales locations in the Carolinas to facilitate the sale of the homes it expects to repurchase. In the quarter ending October 2, 1999, the registrant will provide a pretax charge of $33.6 million ($20.5 million after tax or $0.41 per diluted share). This charge primarily is for the discounting that is anticipated in the reselling of the homes and for the removal and relocation costs associated with the repurchase of the homes. (Emphasis supplied [by plaintiffs]).

a. The August 10, 1999 From 10–K is not a forward-looking statement.

At first glance, the August 10 Form 10–K appears to be a mixed statement that would be eligible for safe harbor protection. However, it is not. Under the Reform Act, there is a specific exclusion from safe harbor protection of forward-looking statements that are contained in financial statements. The portion of the Form 10–K which plaintiffs quote is a note to the section entitled "Financial Statements." Therefore, paragraph 46 does not come within the safe harbor provision.

b. Plaintiffs fail to allege the August 10 Form 10–K was written with the requisite scienter.

Plaintiffs still must allege the requisite scienter, even if the statement does not come within the safe harbor provision. Plaintiffs do not allege any scienter in paragraph 46 and therefore it must be dismissed.

7. The 1998 Annual Report comes within the safe harbor of the Reform Act.

■ Paragraph 26 of the plaintiffs complaint quotes Champion's 1998 Annual Report:

Careful monitoring of retail inventory levels would be essential in 1999. As acknowledged by Champion in its 1998 Annual Report, issued February 10, 1999, "[a]ll aspects of the industry continue to consolidate..." However, Champion stated that such consolidation is "very positive" for Champion because "the retail business will become more professional with better selling practices, lower inventory levels and improved financial systems." To this end, Champion reported that it commenced the "Alliance of Champions" program in 1998 to provide marketing assistance and training in sales and management to independent retailers with a record of success and a commitment to grow. As described in the 1998 Annual Report:

"This program is based on mutual commitments to help our independent retailers grow. We commit to provide quality homes, service, training and marketing support....We don't need franchise papers or exclusivity requirements, just a simple, mutual agreement to do business professionally.

Our strong independent dealers are the key to our continued success....Whether an Alliance member or not, we work with our retailers to develop their management and operating practices.

As described in a January 7, 1999, research report on Champion by David Lee Smith of Dain Rauscher Wessels, entitled "The Name Says It All," this program was initiated by Champion to "improve the overall quality of its independent retailers" by providing, *inter alia,* "inventory control assistance.""

Plaintiffs quote the Annual Report again in paragraph 30 where they allege:

Confident of its continued ability to continue strong sales at both the wholesale and retail levels, Champion's 1998 Annual Report made no mention of any of these growing concerns, instead boasting:

"In 1998, revenues grew 35 percent and diluted earnings per share from continuing operations increased 32 percent...We've also consistently delivered results, with five-year compound annual growth of 25 percent in revenues and 45 percent in diluted earnings per share. In a year when slow growth was anticipated, we delivered significant increases in revenues and profits. We expect to continue to do just that."

a. The 1998 Annual Report is a forward-looking statement.

Here the plaintiffs have quoted both statements of present and historical fact as well as forward-looking statements. As these are both mixed statements I consider them as a whole. In both instances, plaintiffs quote language that indicates Champion's expectations of future performance, whether it is in regard to industry consolidation or past achievements. Therefore, the statements contained in paragraphs 26 and 30 are forward-looking.

b. It is not clear if the 1998 Annual Report is accompanied by meaningful cautionary language.

Neither party submitted a copy of the Annual Report. Therefore, I cannot ascertain whether or not it was accompanied by meaningful cautionary language or determine whether it is protected under the first prong of the safe harbor provision.

c. In any event, plaintiffs fail to allege the 1998 Annual Report was written with actual knowledge of its falsity.

Regardless of the existence of meaningful cautionary language, the quoted por-

tions of the 1998 Annual Report still come within the safe harbor provision. Nowhere in either allegation does plaintiff allege any scienter, much less actual knowledge of falsity. Therefore paragraphs 26 and 30 are protected by the safe harbor provision of the Reform Act.

8. The 1999 Annual Shareholders Meeting comes within the safe harbor of the Reform Act.

 Paragraph 33 states:

At its April 27, 1999, Annual Meeting of Shareholders, CEO Young stated:

> We are very optimistic about our growth potential this year. Our results should benefit from various programs we have implemented to improve our marketing efforts to independent retailers, to company-owned retailers and to developers. *We will continue to manage inventory levels* and share best practices among our retail and manufacturing organizations. (Emphasis supplied [by plaintiffs])

a. The 1999 Annual Shareholders Meeting is a forward-looking statement.

This statement is clearly forward-looking. It is both a statement of future plans and goals, and a statement of future economic performance.

b. It is not clear whether the Shareholders Meeting was accompanied by meaningful cautionary language.

Because neither party submitted a transcript of the 1999 Shareholders Meeting, I cannot determine whether or not Young's statements were accompanied by meaningful cautionary language.

c. In any event, plaintiffs fail to allege the statements from the 1999 Shareholders Meeting were made with actual knowledge of falsity.

Plaintiffs do not allege that the statements they specify in paragraph 33 were made with actual knowledge of falsity. Therefore, these statements are protected under the second prong of the safe harbor provision of the Reform Act and paragraph 33 must be dismissed.

9. The June 18, 1999 press release comes within the safe harbor of the Reform Act.

 Plaintiffs allege in paragraph 34:

Champion's second quarter for 1999 closed on July 3, 1999. Just shortly before the end of the quarter, on June 18, 1999, Champion issued a press release on PRNewswire stating that "earnings for both its manufactured housing and retail businesses for the second quarter ending July 3, 1999 were on track." According to CEO Young:

> [s]ales and earnings continue to be healthy and are showing positive trends in the quarter to date...Manufacturing sales for April and May are higher than last year. We are comfortable with First Call consensus estimates for the second quarter of $0.59 per share, which would be an increase in earnings of 13 percent compared with 1998's results.

Acknowledging that consolidations in the industry "may cause some market uncertainty," Young nevertheless predicted:

> At this time, we are confident that we should have a strong year, and are on target to achieve record performance in 1999.

**a. The June 18, 1999 press release is a forward-looking statement.**

Once again, the statements specified by the plaintiff create a mixed statement. The inclusion of the final forward-looking sentence as part of the entire allegation makes the entire statement forward-looking under the safe harbor provision.

**b. It is not clear whether the June 18, 1999 press release is accompanied by meaningful cautionary language.**

Again, parties have not submitted a copy of the press release with their filings. For this reason I cannot determine whether the press release is accompanied by meaningful cautionary language. Therefore, the June 18 press release is not protected under the first prong of the safe harbor provision.

**c. In any event, plaintiffs fail to allege the June 18, 1999 press release was written with actual knowledge of its falsity.**

Plaintiffs do not make any allegation of scienter regarding the June 18 press release. Therefore, paragraph 34 must be dismissed because the statements it contains are protected by the second prong of the safe harbor provision of the Reform Act.

**10. The July 26, 1999 press release comes within the safe harbor of the Reform Act.**

In paragraph 42 plaintiffs allege:

Champion did not publicly comment on the Parker Homes bankruptcy for over one week. Instead, in a July 26, 1999, press release on PRNewswire, Champion proudly announced its entrance into manufactured housing community development, through its wholly owned subsidiary Champion Development Corporation. Commenting on the new venture, CEO Young, said:

> For decades, Champion Enterprises has provided an outstanding housing value. In the future, many of our home buyers will become residents in a Champion manufactured home community. We believe that this fully integrated approach will allow us to provide our customers a seamless home purchase. Champion will build the home, market it, and place it in an attractive, well-designed community. We believe that by making home buying easier for people who don't own land, we can enhance sales.

Philip C. Surles, Champion's Chief Operating Officer, further explained:

> We are following the successful strategy we use in our manufacturing and retail operations, to find the most talented entrepreneurs in the industry and let them run their businesses. We believe we have started our development company with two of the best manufactured housing community development teams in the industry.

Champion's Executive Vice President, Chief Strategic and Financial Officer, Joseph H. Stegmayer ("CFO Stegmayer"), noted:

> We are approaching community development with joint venture partners to maintain our strong balance sheet and our superior returns on shareholder equity. These joint venture developments should provide good returns on a stand alone basis, and the company will have additional profit opportunities within its manufacturing retail and finance subsidiaries with the sale of Champion product in these communities.

CEO Young concluded:

> We are excited about our entrance into the community development busi-

ness. Historically, new development has occurred sporadically by local area builders, creating an uncertain supply of new sites for manufactured homes. We see an immense opportunity as we focus our national sales network and market knowledge on systematically developing and marketing well-planned communities. We envision ourselves playing a dominant role in our industry's real estate opportunities.

### a. The July 26 press release is a forward-looking statement.

The above quoted paragraphs contain statements of future economic performance, statements of plans and objectives for future operations. Therefore, they are forward-looking statements as defined by the Reform Act.

### b. It is not clear whether the July 26 press release is accompanied by meaningful cautionary language.

Because neither party has submitted a copy of the press release, I cannot determine whether or not it is accompanied by meaningful cautionary language. Therefore, it does not come within the first prong of the safe harbor provision.

### c. In any event, plaintiffs fail to allege the July 26 1999 press release was written with actual knowledge of falsity.

Once again, plaintiffs do not allege that the press release was written with actual knowledge of falsity. Therefore, the statements contained in paragraph 42 of plaintiffs' complaint are protected under the second prong of the safe harbor provision and paragraph 42 must be dismissed.

### B. Non Forward-Looking Statements

As to the paragraphs which do not contain forward-looking statements, plaintiffs have not alleged the requisite scienter in *any* of them. In nearly all of the allegations/paragraphs, plaintiffs merely quote the defendants and do not even mention scienter. Plaintiffs attempt to rely on implication and innuendo, requiring me to mix and match statements and facts and supply the requisite allegation. This does not comport with the Reform Act's clear requirement of specific pleading of requisite scienter.

#### 1. Paragraph 27

Plaintiffs quote analysts' predictions of slow sales in 1999. The analysts also note a tightening of credit, a shortage of lots and excess inventory which could be "dumped" during a shakeout were reasons for the cautious forecast. However, plaintiffs do not elaborate. They make no connection to statements by the defendants, nor do they allege that this statement, or any other is recklessly misleading. Because of this failure to allege scienter, this paragraph must be dismissed.

#### 2. Paragraph 28

In paragraph 28, plaintiffs quote another analyst who stated that credit had tightened and that, while store level inventory was appropriate, new retailers meant higher levels of inventory industry-wide. Plaintiffs do not elaborate here either. They make no connection to statements by the defendant, nor do they allege that any statements were recklessly misleading and thus, paragraph 28 must be dismissed.

#### 3. Paragraph 29, Report of Dain Rauscher Wessels

Plaintiffs quote a report issued by written by David Lee Smith of Dain

Rauscher Wessels which quotes Champion as stating "that it has seen good traffic patterns in most parts of the country." Smith also writes that one of Champion's operations was performing lower than expectations, but that shipments in that region were slow and competition intense. Once again, plaintiffs do not connect this fact to any other, nor do they allege that it is misleading and recklessly made, and thus, paragraph 29 must be dismissed.

### 4. Paragraph 31, April 21, 1999 Press Release

In the April 21 press release Champion announces that it is outpacing the industry, that net income increased 20 percent and earnings per share grew 19 percent. Nothing further is alleged in this paragraph nor do any further allegations specifically relate back to this paragraph. Plaintiffs have failed to allege the requisite scienter and thus, paragraph 31 must therefore be dismissed.

### 5. Paragraph 32, Report of CIBC Oppenheimer

In this paragraph, plaintiffs note Oppenheimer's report of industry concern over high retail inventory and that at the same time, according to Oppenheimer, Champion reported appropriate levels of inventory at stores and independent retailers. Plaintiffs fail to explain the relevance of these reports. They do not make any allegations that Champion's report was recklessly misleading and thus paragraph 32 must be dismissed.

### 6. Paragraph 39

In paragraph 39 plaintiffs recite numerous factors that they contend show "the above" *unspecified* statements to be "materially false, misleading and incomplete." Plaintiffs do not connect these facts to the statements included in their complaint. Neither do they explain how these factors show that the statements are "materially false, misleading and incomplete." This attempt to remedy the failures of the preceding allegations does not comply with the stringent pleading requirements of the Reform Act and thus, paragraph 39 must be dismissed.

### 7. Paragraph 40, Second Quarter Earnings in Violation of GAAP

Plaintiffs here allege violations of Generally Accepted Accounting Principles (GAAP). They allege that the second quarter earnings reported by Champion were calculated in violation of GAAP because Champion did not accrue a loss for Parker Homes' bankruptcy, even though the bankruptcy did not occur until after the close of the second quarter. Though they did not accrue a loss, defendants did, in a footnote, disclose Parker Homes' bankruptcy and the $33.6 million charge. Even if this is a violation of GAAP this allegation alone cannot sustain the complaint. According to the Sixth Circuit in *In Re Comshare*, "The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *Comshare*, 183 F.3d at 552; *See also, Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.2000). Thus, paragraph 40 must be dismissed.

### 8. Paragraph 41, Parker Homes Bankruptcy Filing

Plaintiffs note, in paragraph 41, that Parker Homes filed for bankruptcy on July 22, 1999. They do not allege any misstatement or omission and thus, paragraph 41 must be dismissed.

### 9. Paragraph 46, Form 10–Q, Filed August 9, 1999

As stated above, (*see* IV.A.6 *supra*) plaintiffs do not make any allegation of

scienter and thus, paragraph 46 must be dismissed.

### 10. Paragraph 47

As in their attempt in paragraph 39, plaintiffs again mention various facts and assertions which they claim make the statements in paragraphs 41–46 "materially false, misleading and incomplete." However they once again fail to *specifically* allege scienter for any of the statements as required by the Reform Act and thus paragraph 47 must be dismissed.

### 11. Paragraph 48

Plaintiffs' allegations in paragraph 48 are concerned mainly with the supposed improper conduct of Parker Homes. Plaintiffs describe the "scheme" in which Parker Homes generated sales volume by adding rebates and cash advances given by Champion to the retail prices of the homes. They seem to imply a kind of *respondeat superior* liability in which Parker Homes' alleged misdeeds give rise to Champion's scienter. The Sixth Circuit did not hold a defendant liable for its own subsidiary's actions. *See Comshare* at 553. "[T]his Court should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls." *Id.* The relationship between Champion and Parker Homes is not the close relationship between parent and subsidiary; it is between a business and its independent customer. If recklessness cannot be presumed for a parent company than it certainly cannot be presumed here. Thus, paragraph 48 must be dismissed.

### 12. Paragraph 49

In paragraph 49 plaintiffs state, "In a complete turnaround from its announced position on July 30, 1999, that it would not purchase any Parker Homes sales centers, on August 26, 1999, Champion received Court approval of its purchase of the leases for 37 Parker Homes locations and Parker Homes's inventory. . . ." Plaintiffs merely assert that Champion pursued a plan that was different than the plan initially announced. They make no allegations that a statement was recklessly misleading nor that any statement was recklessly made. Thus, paragraph 49 must be dismissed.

### 13. Paragraph 50

Plaintiffs state that during an August 26 conference call, Young announced the purchase of assets and inventory and noted that there were 1,000 more retailers in the industry than needed. They also allege that "CEO Young attributed the problem to manufacturer's 'unfortunate[ ]' encouragement of independent retailers to increase their inventory." Finally, plaintiffs point out that Champion's stock price dropped $3.00 by the end of that day. Plaintiffs do not allege that Young's statements were recklessly misleading and, thus, paragraph 50 must be dismissed.

### 14. Paragraph 51, Detroit Free Press, December 8, 1999

Plaintiffs point out an article in the Detroit Free Press that "explained the genesis of the excess inventory problem which caused Champion to close five plants in August 1999." In that article CEO Young is quoted saying, "We were part of the problem. . . ." However, plaintiffs merely refer to this letter. They do not make any allegation that this implicates other specific statements, that they were recklessly misleading and, thus, paragraph 51 must be dismissed.

### 15. Paragraph 52, 1999 Form 10–K filed March 23

Plaintiffs make a number of calculations based on Champion's 1999 Form 10–K (the

annual report filed with the SEC for 1998) allegedly revealing Champion's loss per repurchased home in 1998. They point out that Champion revealed that 100 retailer locations had gone bankrupt, which was contrary to Young's July 21 statement that only one or two retailers had gone bankrupt. However, plaintiffs do not allege that the statement was recklessly misleading at the time it was made. Nor do they allege that any other statement was recklessly misleading thus, paragraph 52 must therefore be dismissed.

### 16. Paragraph 53

■ Plaintiffs allege that Champion's 1999 Form 10–K does not "adequately disclose" all the components of the $33.6 million charge taken due to Parker Homes bankruptcy. They attempt to implicate the July 30, 1999 statements by also stating that on November 10, 1999 Champion announced that some of its loss was due to unrecoverable discounts. They allege that Champion's disclosure was not adequate because it did not detail the amount or type of discount given. Regardless of whether the ordinary standard of care would require such disclosure (and it is not clear that it does), plaintiffs fail to allege the requisite scienter or any scienter at all and, thus, paragraph 53 must be dismissed.

### 17. Paragraph 54

Plaintiffs again refer to Champion's 1999 Form 10–K and quote:

At January 1, 2000, the Company was contingently obligated for an additional purchase price of up to $139 million related to its 1999 and 1998 acquisitions. Management currently believes that payment of $75 million of this contingent purchase price is reasonably possible.

Plaintiffs claim that "this disclosure portends catastrophe" given Champion's re-

ported net income. However, they do not allege that this or any other statement was recklessly misleading and, thus, paragraph 54 must be dismissed.

### 18. Paragraph 55

■ Plaintiffs note Young's announcement, during a February 16, 2000, conference call, that Champion had instituted programs to prevent inventory stockpiling. Plaintiffs make no allegation that this or any statement was recklessly misleading and, thus, paragraph 55 must therefore be dismissed.

### 19. Paragraph 56

Plaintiffs state that while reporting its first quarter results in an April 19, 2000 press release, Young stated that Champion was monitoring inventory levels. Plaintiffs do not allege that this statement was recklessly misleading and, thus, paragraph 56 must be dismissed.

### 20. Paragraph 57

■ Plaintiffs refer to a May 2, 2000 news release in which Young "commented...that he was 'pleased' that company-owned store inventory had been reduced from 23 homes per location in March 1999 to 19 homes per location in March 2000." Plaintiffs further state that "this common sense approach, which Champion repeatedly claimed to have been following *during* the Class Period...was not actually undertaken until late August 1999." However, plaintiffs do not allege that any statement made during the Class Period was recklessly misleading and, thus, paragraph 57 must be dismissed.

### 21. Paragraphs 58–78.

The remainder of the complaint is merely generalized argument with no specific allegations of recklessly misleading state-

ments or omissions made with the requisite scienter.

### C. Section 20(a) of the Securities Exchange Act of 1934

██ In paragraphs 79–83 plaintiffs also allege violations of section 20(a) of the Securities Exchange Act of 1934. Section 20(a) imposes liability upon a controlling person who aids and abets violations of the Securities Exchange Act. Plaintiffs allege that defendant Young is a controlling person under section 20(a) and that Young "had the power and influence and exercised the same to cause Champion to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above." This allegation relies on the allegations preceding it. These allegations must be dismissed for failure to satisfy the requirements of the Reform Act. Because plaintiffs have failed to adequately plead a violation of the Securities Exchange Act wrongdoing, there is no basis for this allegation and this portion of the complaint also fails. Thus, paragraphs 79–83 must be dismissed.

## VII. CONCLUSION

At a status conference held on September 21, 2000 plaintiffs adamantly asserted that they had pleaded in conformance with the Reform Act. Plaintiffs' counsel stated:

> I hope that when you read our consolidated amended complaint, it reflects we did a lot of work and investigation...before we filed.....[W]hat I think I can tell your Honor is that basically we have pled with tremendous specificity....Your Honor, we take very seriously our requirements under the—under the PSLRA. We don't just file lawsuits because the stock price drops....We do a lot of work and we do a lot of investigation and we hope that—that our complaint reflects that. And you'll see that we pled with tremendous specificity. You know, we don't have the—we can't do discovery, so we can only do what we can do without the benefit of discovery. But we didn't just make it—make naked allegations. We really—worked hard on that. Tr. pp. 19–20.

I have carefully reviewed plaintiffs' consolidated amended complaint paragraph by paragraph. I did so in light of counsel's assurance to me, above quoted, that basically they "pled with tremendous specificity." I considered that they filed three complaints and that they knew well what their responsibilities were when they were allowed, on March 30, 2000, to file an amended consolidated complaint. For the reasons stated in this opinion, in an analysis of each allegation(s) in each paragraph of the amended complaint, they have not complied with the clear mandate of the Reform Act.

An opinion from the Northern District of California aptly describes what the plaintiffs did or did not do in the amended complaint. "The court finds that the plaintiff has failed to make each allegation 'simple concise and direct' in violation of Rule 8(e) [of the Federal Rules of Civil Procedure]. Moreover, in contravention of the Reform Act, plaintiff has failed to craft a Complaint in such a way that a reader can, without undue effort, divine why each alleged statement was false or misleading." *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1243 (N.D.Calif.1998). While I am of the opinion that the motion to dismiss with prejudice be granted I will stay the issuance of that order until I hear arguments on the motion to amend.